**Maynard MALOY**

v.

**A. E. ANDREWS & SON and/or New Hampshire Insurance Co. or W. H. Hinman, Inc.**

Supreme Judicial Court of Maine.

Aug. 3, 1970.

Ralph W. Farris, Jr., Augusta, for plaintiff.

Berman, Berman & Flaherty, by Christopher A. Moen, Jr., and David M. Cohen, Portland, for A. E. Andrews and/or New Hampshire Ins. Co.

Lawrence P. Mahoney, Portland, for W. H. Hinman.

Before WILLIAMSON, C. J., and WEBBER, MARDEN, DUFRESNE, WEATHERBEE and POMEROY, JJ.

WILLIAMSON, Chief Justice.

In this Workmen's Compensation case the question is whether at the time of petitioner Maloy's injury he was in the employ of Elmer A. Andrews, d/b/a A. E. Andrews & Son (Andrews), or W. H. Hinman, Inc. (Hinman), or both. It is agreed Maloy is entitled to compensation.

The Industrial Accident Commission found that Andrews was the employer. From this decision Andrews appeals pointing to Hinman as the employer, or in the alternative to Andrews and Hinman jointly as the employers.

"39 M.R.S.A. § 99 provides in part that a decision of the Commission 'in the absence of fraud, upon all questions of fact shall be final.' We look only to see if the decision rests on some legally competent and probative evidence and is not merely the result of speculation, conjecture or guesswork." Bradbury v. General Foods Corporation, Me., 218 A.2d 673, 674. See Bernier v. Coca-Cola Bottling Plants, Inc., Me., 250 A.2d 820; Tiko v. Hiram Ricker & Sons, Inc., Me., 251 A.2d 510.

"Employee" is defined, for our purposes, in the Workmen's Compensation Act as follows:

"§ 2. *Definitions*

The following words and phrases as used in this Act shall, unless a different meaning is plainly required by the context, have the following meaning: * * "

* * * * * *

"5. *Employee.* 'Employee' shall include * * * every person in the service of another under any contract of hire, express or implied, oral or written, except: * * *"

Andrews, whose business is located in Gardiner, leased three ten-wheel trucks owned by him by oral agreement to Hinman to be used in hauling gravel from a pit in Cumberland, Maine to a "dump site" on a highway construction project at Back Bay in Portland.

Maloy was hired in Gardiner by Andrews to drive one of the trucks on the Hinman job. Andrews drove Maloy to the pit. Maloy was then shown the method of entering and leaving the pit, the method of dumping the gravel, and the routes between the pit and "dump site". He was also informed of the arrangements by Andrews for his trucks to be serviced, maintained, and left each night at "Hazelton's Equipment place" in Cumberland about five miles from the pit. Maloy was a passenger in an Andrews truck for three trips and until his instructor was satisfied that he was a competent driver.

For six days until the accident Maloy drove a truck without incident. On returning to the pit from the "dump site", Maloy noticed a flat tire. He drove the truck to Hazelton's. As Maloy said, "We had spare tires, etc. there." While he was changing the tire, Maloy was injured.

The Commission in its findings said, in part:

"The lessor, A. E. Andrews & Son, agreed to furnish a driver for each truck leased to W. H. Hinman. W. H. Hinman agreed to pay $8.00 per hour for the use of truck and driver. Because of Federal regulations, the drivers furnished by E. A. Andrews were carried on Hinman's payroll at certain minimum wages. W. H. Hinman would allocate $6.06 per hour for the use of the truck, and $1.94 per hour for the drivers. At the end of the week, A. E. Andrews would receive a check from Hinman for the leased trucks based on an hourly rate of $6.06. The drivers would receive their checks directly from W. H. Hinman based on an hourly rate of $1.94 with the usual payroll deductions for F.I.C.A. and withholding taxes. There was no understanding between A. E. Andrews and Hinman as to 'control of the drivers.' Hinman gave directions as to the route to be followed by the drivers on the job. W. H. Hinman would determine the working hours for the drivers. This information would be conveyed to either Elmer Andrews, the owner, or Cecil Fish, the foreman for A. E. Andrews. This information would then be related to the other drivers by either Mr. Andrews or Mr. Fish. Furthermore, the job superintendent for W. H. Hinman would talk to Mr. Cecil Fish if there were 'anything wrong with the drivers or trucks' leased to Hinman. The Commission also finds that A. E. Andrews was *solely responsible for the maintenance and care of the leased trucks.* (Emphasis supplied.) A. E. Andrews would leave the trucks all night at Hazelton's garage during the period these trucks were leased to Hinman. If any of the trucks were disabled for any period of time, Hinman was not liable under its leasing *s*greement to make payments during said period of disability. It was customary to all allow 10 or 15 minutes to make necessary minor repairs, such as replacing a flat tire."

The record shows that the lease arrangement of $8.00 an hour for truck and driver was modified in two respects. If an Andrews driver worked "overtime" he would receive one and one-half the going wage. The increase would be borne by Hinman. The $6.06 per hour payment to Andrews for the truck would continue unchanged. There was no "overtime" for the truck.

A half hour for truck with driver was also included to cover an estimated time of return each day from the last delivery

of gravel at Back Bay to the pit. Hinman had no interest in whether the truck in fact so returned directly. In fact, the truck was left at Hazelton's for the night and was driven in the morning to the pit.

Thus, while the truck was in operation on the job, Hinman paid the driver $1.94 an hour (with overtime) and Andrews $6.06, or as agreed by the parties, $8.00 per hour for truck with driver.

When the accident occurred at Hazelton's five miles from the pit, the truck was not in operation on Hinman's "time" under the lease. Neither Andrews nor Maloy were at that moment earning any amount directly or indirectly from Hinman. It may fairly be inferred that Maloy was entitled to pay from Andrews during this maintenance period.

Andrews, in his argument, makes two points: first, that at the time of the accident Maloy was in the special employ of Hinman, which was the sole responsible employer, and second, alternatively that both Andrews and Hinman were jointly responsible employers.

The principles governing whether X, an employee of A, has been loaned to B, were set forth comprehensively by our Court in Boyce's Case, 146 Me. 335, 81 A.2d 670 (1951). In holding B liable for compensation as the employer of X, the Court said at p. 340, 81 A.2d at p. 673:

"Whether a servant of one employer has been loaned to another is determined by the circumstances surrounding both the general employment and the special employment. Who controls and directs him and his activities in the new and particular service? Does he continue to be under the control of his general employer, or does he become, for the time being, subject to the exclusive control and direction of the person to whom he has been loaned? Does the employee himself, know and consent, and does he submit to the direction and control of the new master? The fact that an employee is the general servant of one employer does not, as a matter of law, prevent him from becoming the particular servant of another. It is the general rule that when one lends a servant to another for a particular employment, and the servant is under exclusive direction and control of that other in the particular employment, he must be dealt with as the servant of the one to whom he is loaned. Torsey's Case, 130 Me. 65, 153 A. 807; Gagnon's Case, 128 Me. 155, 158, 146 A. 82; Wyman v. Berry, 106 Me. 43, 75 A. 123; Pease v. Gardner, 113 Me. 264, 93 A. 550; Wilbur v. Construction Co., 109 Me. 521, 85 A. 48; Beaulieu v. Tremblay, 130 Me. 51, 153 A. 353; Frenyea v. Steel Co., 132 Me. 271, 170 A. 515. Consent or acquiescence of the employee to the change of employment may be inferred from the servant's acceptance of or obedience to orders given by the special employer. Torsey's Case, 130 Me. 65, 153 A. 807. The fact that a loaned servant remains on the payroll of his general employer is not decisive of the question of employment. It is a circumstance to be considered. Chisholm's Case, 238 Mass. 412, 131 N.E. 161."

Earlier the question of direction and control upon employment was considered in Gagnon's Case, 128 Me. 155, 146 A. 82 (1929), and in Torsey's Case, 130 Me. 65, 153 A. 807 (1931). We said in *Torsey*, at p. 67, 153 A. at p. 808:

"And in cases where one lends his servant to another for a particular employment, in determining whether the servant is an employee of his original master or of the person to whom he had been furnished, the test is whether, in the particular service in which he is engaged or requested to perform, he continues liable to the direction and control of his original master or becomes subject to that of the party to whom he is lent or hired. If men are under the exclusive control of a special employer in the performance of work which is a part of his business, they may be, for the time being, his em-

ployees, although they remain general servants of their regular employer."

 The Commission properly did not place employment in Hinman upon whatever direction and control it might exercise under the lease. As we have noted, the accident occurred when the truck with Maloy was not engaged in hauling gravel. There was no direction or control then exercised by Hinman. We need not therefore consider, nor do we consider, whether while engaged in hauling the gravel Maloy could have been found to be in the employ of Hinman.

The right to hire and discharge is a factor bearing upon the relationship of employer-employee. Here, Andrews furnished the truck with driver. Without question, Hinman could have rejected the services of an incompetent driver. In this sense it may be said Hinman could have discharged a driver supplied by Andrews. There is nothing to indicate that under the lease Hinman had the authority to employ drivers for the leased trucks. The right to insist on competency in the driver of the leased truck does not negate the conclusion that the hiring and discharge of Andrews' drivers were matters for Andrews and not for Hinman.

The fact that Maloy was on Hinman's payroll also has a bearing on the issue of employment. It is not, however, conclusive of employment by Hinman or non-employment by Andrews.

 We approve the statement of the Commission as follows:

"It is of very little significance whether the special employer pays the general employer who in turn pays the employee, or whether the special employer pays the employee direct. The courts have found that this difference is only one of mechanics and not of substance. Campbell v. Connolly Const. Co., 179 Minn. 416, 229 N.W. 561, 563; Dennison v. Peckham Road Corp., 295 N.Y. 457, 68 N.E.2d 440".

See also 1A Larson Workmen's Comp. § 48.30, p. 834.

We note in Torsey, supra, the special employer had exclusive control over the employee, although he remained on the payroll of the general employer. For like reasons in the converse situation of the employee on the payroll of the alleged special employer, the fact is not conclusive of who is the employer. *Gagnon's Case,* supra; Dennison v. Peckham Road Corp., 295 N.Y. 457, 68 N.E.2d 440.

We need touch only briefly on Andrews' second point. It is unnecessary for us to consider under what circumstances there may be liability as joint employers under the Workmen's Compensation Act. In the case before us, it is plain that Hinman's interest in the truck and his responsibility, if any, for the operation of the truck by Maloy had ended before the accident. Maloy was injured "by accident arising out of and in the course of his employment" by Andrews. 39 M.R.S.A. § 51. See also *Gagnon's Case,* supra; Dennison v. Peckham Road Corp., supra.

In general, on "Lent Employees and Dual Employment," see 1A Larson Workmen's Comp. § 48, et seq.

The entry will be

Appeal denied.